OPINION
{¶ 1} The Township of Beavercreek, Ohio terminated the employment of paramedic, Melanie Snyder. The termination was affirmed by the Greene County Court of Common Pleas. On appeal to this court, Snyder contends that the evidence does not support her termination.
 {¶ 2} We conclude that the record contains reliable, probative and substantial evidence to support the decision of the Township and the trial court. Therefore, the judgment of the trial court is Affirmed.
 I {¶ 3} Snyder was employed as a firefighter/paramedic with the Beavercreek Township Fire Department. On August 30, 2004, Township medic crews received a call to respond to a cardiac arrest at a local restaurant. The first crew to arrive performed CPR. The second crew arrived and hooked up the monitor. Shortly thereafter, the third crew, including Snyder, arrived. Firefighter/paramedic Ryan Williams was the senior paramedic on the scene and was acting as the Officer in Charge.
 {¶ 4} Snyder spoke with the patient's wife while other crew members attempted to establish an IV line and to insert an endotracheal tube (ET Tube) into the patient's airway. After ascertaining that the patient was an insulin dependent diabetic, Snyder informed the other crew members and asked whether the patient's blood sugar had been checked. A glucometer was retrieved and a blood sugar reading was taken. The reading indicated a blood sugar level of 41 milligrams per deciliter. Snyder then informed Williams that they needed to "look at" the blood sugar issue as a possible cause of the cardiac arrest. Williams informed Snyder that they first needed to establish an airway and an IV, and that they needed to administer cardiac drugs before dealing with the blood sugar.
 {¶ 5} Snyder then assisted with the insertion of the ET Tube. Once the tube was in place, Snyder administered the first dose of Epinephrine down the ET Tube. Snyder then retrieved an ampoule of Dextrose 50% solution (D50) as well as another dose of Epinephrine. She took the drugs and went back to the patient's head and placed the drugs on the floor by her knees. Snyder heard someone say that the IV line had been established. She then administered the D50 down the ET Tube. Snyder then performed a second blood sugar check and determined that the level had raised to 79 milligrams per deciliter. The patient was subsequently transported to Miami Valley Hospital where he was pronounced dead.
 {¶ 6} A few hours later, Snyder received a telephone call from Tom Grismer, another firefighter/paramedic who had responded to the cardiac arrest. Grismer informed Snyder that he needed to document the fact that she had inserted D50 into the ET Tube. At that point, Snyder exclaimed, "Oh my God. I must have done that. I did that, didn't I?"
 {¶ 7} Of relevance to this case, the record established that there are only four liquid drugs which may be administered via an ET Tube; Epinephrine, Lidocaine, Narcan and Atropine. D50 is supposed to be administered via an IV line.
 {¶ 8} On September 27, Snyder was notified by letter that she was being charged with "misfeasance and gross neglect of duty" with regard to the incident. The charges were based upon the claim that she failed to follow a supervisor's order, failed to "maintain proficiency and knowledge of the Greater Miami Valley EMS Council Standing Orders," and that she attempted to conceal her error in medicating the patient. A hearing was held before the Beavercreek Township Board of Trustees, following which the Trustees issued the following findings:
 {¶ 9} "During the incident, Firefighter Ryan Williams, as the first senior medic and Officer in Charge, was in command. Ms. Snyder directly disobeyed the direction of Mr. Williams when she retrieved the drug Dextrose 50% (`D50') from the drug bag after Mr. Williams specifically stated that the cardiac arrest needed to be addressed first. Although Mr. Williams testified on the stand, that, if Ms. Snyder had appropriately administered D50 at the time when she did administer it improperly, such action would have been medically acceptable, this testimony does not excuse Ms. Snyder's actions in disobeying the Officer in Charge of the Incident. Ms. Snyder, at the least, should have informed Mr. Williams that she was preparing the D50 for administration before administering it to the patient.
 {¶ 10} "During the incident, Ms. Snyder pushed 50 ml of D50 down the patient's endotracheal tube (`ET Tube'). D50 is not supposed to be administered through the ET Tube, but rather is for intravenous use only. D50 is know to have a necrotic effect on tissue and could seriously injure or kill a patient if administered down the ET Tube and into the lungs. Further, 50 ml is five times the amount of liquid medication that can be safely administered through an ET Tube. This was an egregious error by Ms. Snyder and in contravention of the General Orders and Standing Orders of the Township Fire Department/Greene County Protocols.
 {¶ 11} "D50 is a viscous, syrupy liquid that comes in a tube approximately five times larger that the epinephrine (`Epi'), which is the drug that was supposed to go down the ET Tube. It takes two hands to assemble and administer D50 and a significant amount of force to push the substance out of its ampoule. It takes between ten and fifteen seconds to empty an ampoule of D50. Comparably, Epi takes only one hand to administer and only two to three seconds to empty. Further, D50 is housed in a large, blue box while Epi is in a smaller, brown box, and the ampoule and box are labeled with the medication name.
 {¶ 12} "Ms. Snyder testified that, after she heard someone indicate that an IV had been placed, she thought she handed the D50 off to that person for appropriate administration and she grabbed the second dose of Epi to push down the tube. Ms. Snyder indicates that she believes when she pushed the D50 down the tube she must have thought it was the Epi and not D50, although she has no specific memory of pushing either drug down the ET Tube. The Board finds this testimony disingenuous, at best, given the significant difference in size between D50 and Epi, the difference in the amount of time it takes to push D50 versus the amount of time it takes to push Epi, and the difference in the amount of force it takes to push D50 versus Epi. The Board therefore attributes no credibility to this testimony and finds that Ms. Snyder knew she was pushing D50 down the ET Tube at the time she was doing it.
 {¶ 13} "The Board further discredits Ms. Snyder's testimony that she does not recall pushing the D50 down the ET Tube based on the fact that she can accurately recall nearly every other detail of the incident except her own mistake. She accurately recalled each individual who was working on the patient when she arrived, exactly what she did when she first arrived, the patient's initial blood sugar reading, getting D50 and Epi 1:10,000 from the drug bag and placing them between her knees while kneeling at the patient's head, assisting with placing the ET Tube, and hearing that an IV had been placed. The only detail on which her memory is less than clear is her own mistake of pushing D50 down the ET Tube. The Board does not find this testimony credible and finds that Ms. Snyder knew she was pushing D50 down the ET Tube at the time she was doing it.
 {¶ 14} "Regardless of whether Ms. Snyder actually realized she was making a mistake while pushing D50 down the ET Tube while she was doing it, the Board finds that Ms. Snyder unequivocally knew, immediately after pushing D50 down the ET Tube, that she had made a mistake. Ms. Snyder testified that, during the incident, she realized she was holding an empty ampoule of D50 and that she was near the patient's head and nowhere near the IV site where the D50 should have been administered. At this point, Ms. Snyder knew that the D50 was no longer in its ampoule and must have gone somewhere. Even if she did not realize that she had just pushed the D50 down the ET Tube, she should have spoken up about the fact that it had clearly not been administered intravenously, as is the appropriate method to administer D50.
 {¶ 15} "Ms. Snyder knowingly failed to inform the emergency transport crew that the D50 had been administered improperly.
 {¶ 16} "During the Incident, Ms. Snyder was tasked with informing Miami Valley Hospital that a transport crew was on its way with the patient. During this communication, Ms. Snyder knowingly failed to inform Miami Valley Hospital that the D50 had been administered improperly.
 {¶ 17} "Ms. Snyder was dishonest when she told Firefighter Tom Grismer and her supervisor that she did not realize she had made the mistake until she was confronted with it several hours later.
 {¶ 18} "Ms. Snyder demonstrated a lack of proficiency with respect to the Fire Department's Standing Orders, General Orders and policies and procedures when she administered D50 down the ET Tube and then failed to announce that D50 had been administered other than intravenously.
 {¶ 19} "The patient died of a massive heart attack. Ms. Snyder's mistake did not contribute to the patient's death."
 {¶ 20} Snyder's employment was terminated and she filed an administrative appeal to the Greene County Common Pleas Court. The trial court affirmed the decision of the township trustees, concluding that the decision was supported by the record. From the judgment of the trial court, Snyder appeals.
 II {¶ 21} Snyder's sole assignment of error is as follows:
 {¶ 22} "THE TRIAL COURT ERRED IN FINDING THAT SUBSTANTIAL EVIDENCE SUPPORTED THE DECISION OF APPELLEE TRUSTEES, AND SHOULD BE REVERSED."
 {¶ 23} Snyder contends that the trial court erred by affirming the decision of Trustees. In support, she raises numerous arguments discussed below, all of which address the issue of whether the evidence supports the decision of the Trustees.
 {¶ 24} As provided in R.C. Chapter 2506, a common pleas court reviews a township's decision to terminate a paramedic's employment to determine if the decision was "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence[.]" R.C. 2506.04. In conducting its review, the common pleas court is to give due deference to the Township's resolution of evidentiary conflicts, and may not "blatantly substitute its judgment for that of the [Township]." Dudukovich v. LorainMetro. Housing Auth. (1979), 58 Ohio St.2d 202, 207. The common pleas court is required to affirm the Township's decision if it is supported by a preponderance of reliable, probative and substantial evidence. Id.
 {¶ 25} This court's reviewing role is even more limited. We must determine whether the common pleas court properly applied the standard of review set forth in R.C. 2506.04. Our determination is limited to the issue of whether, as a matter of law, a preponderance of reliable, probative and substantial evidence exists to support the decision of the Township, so that the common pleas court did not abuse its discretion in sustaining the Township's decision. Budd Co. v. Mercer (1984),14 Ohio App.3d 269, 273-274.
 {¶ 26} Snyder first contends that the Trustees incorrectly found that Williams was the Officer in Charge of the scene at the restaurant, and that she deliberately disobeyed his orders.
 {¶ 27} We begin with the question of whether the evidence establishes that Williams was in charge at the scene. We note that Snyder testified that it was unclear who was in charge of the scene. Lieutenant Robert Young also testified that he was not sure who was in charge at the time he arrived on the scene. However, Williams testified that as the senior paramedic at the scene, he was the officer in charge. He testified that he was in control of the drug bag and that he was in charge of handing out the drugs for administration to the patient.
 {¶ 28} Obviously, there is some evidentiary conflict with regard to this issue. However, any issues of credibility as they affect determinations of fact are best left to the trier of fact. Williams's testimony, alone, constitutes competent evidence upon which the Trustees could reasonably base a finding that Williams was in charge of the scene. Additionally, we note that Snyder's own testimony corroborates this finding. Specifically, Snyder testified that, after learning that the patient was diabetic and getting a blood sugar reading, she made sure that Williams was aware that the blood sugar issue needed to be addressed. She also admitted that Williams then told her that prior to administering D50, they needed to get the ET Tube and IV established and that they needed to first administer the cardiac drugs. This testimony could be reasonably construed as indicating that Snyder was reporting to Williams and that she was aware that Williams was dictating the terms of the treatment. Thus, we conclude that the evidence supports the finding of the Trustees in this regard.
 {¶ 29} We next address the claim that the Trustees erred in determining that Snyder disobeyed Williams. As stated above, there is evidence that Snyder was aware that Williams was in charge of the scene. There is also evidence that Snyder was aware that Williams, after being informed of the blood sugar issue, wanted to resolve the cardiac issues first. In other words, he wanted to get the IV and ET Tube in place and get the cardiac drugs administered prior to addressing any other issues. There is no evidence that Williams authorized the administration of the D50. The evidence demonstrates that Williams was in control of the drug box during the incident, that he was the person handing out the drugs to be used, and that he did not hand out the D50. Instead, Snyder admitted that she removed the D50 from the box. Additionally, as set forth below, the evidence shows that Snyder administered the D50. Thus, we find evidence upon which the Trustees could base a finding that Snyder disregarded the decision of the officer in charge of the scene.
 {¶ 30} Snyder next contends that the Trustees erred by finding that she administered the D50 via the ET Tube. In support, she argues that the record is devoid of evidence to support a finding that she administered this drug.
 {¶ 31} From our review of the evidence, we note that during the hearing of this matter, Snyder's counsel admitted that Snyder made the mistake of administering the D50, but also stated that Snyder had no specific recollection of having done so. It appears that the "theory" of Snyder's case was to imply that she simply made a mistake and that she did not intentionally fail to obey the senior medic's orders. The theory of the defense case was not, as is now claimed, that Snyder did not, in fact, administer the D50.
 {¶ 32} Snyder testified that, after the ET Tube was inserted, she grabbed the D50 and Epinephrine from the drug bag and placed them next to her at the patient's head. She testified that she heard someone say that the IV was in, and that she "thought" she passed the D50 off to someone to administer via the IV. After a few more minutes, she re-checked the blood sugar level — a step she admitted is normally only done after D50 is administered. While she testified that she did not realize that she had pushed the D50 down the tube until Grismer informed her by telephone of the mistake, she also testified that during the call she exclaimed that she "must have" done it. She also testified that she was located beside the patient's head during the incident, that she was not near the IV line, and that she still "had the dextrose thing" in her hand afterward. Further, Snyder's own handwritten statement, which was written the day after the incident and which was admitted into the record, states "I grabbed the Dextrose and inadvertently pushed it down the ET." Later in the statement, she wrote that when Grismer called to tell her that he needed to document her administration of the D50, she stated that "it did not even occur to me until he said it that I had done so."
 {¶ 33} More importantly, when asked whether Snyder had told the patient's widow that she had administered the D50, Snyder answered affirmatively. The widow of the patient also testified that Snyder had informed her that she had administered the D50.
 {¶ 34} We conclude that this constitutes evidence upon which the Trustees could reasonably rely in concluding that Snyder administered D50 to the patient. We further conclude that the trial court did not err in affirming this finding.
 {¶ 35} Snyder's next argument centers on the claim that the Trustees erred in finding that "D50 is known to have a necrotic effect on tissue and could seriously injure or kill a patient if administered down the ET Tube and into the lungs, [and] that 50 milliliters is five times the amount of liquid medication that can be safely administered through an ET Tube." She further argues that the Trustees erred in finding that "it takes a significant amount of force to push D50 out of its ampoule and takes between ten and fifteen seconds to empty an ampoule of D50." Again, our review of the record supports the finding of the Trustees and the trial court.
 {¶ 36} Battalion Chief, Dan Paxson, a certified paramedic who oversees the Beavercreek EMT program, testified that paramedics are taught and trained to administer D50 directly into veins via an IV line. He further testified that if the D50 escapes the "vascular space" it can cause tissue death and that paramedics are taught and trained that D50 can cause tissue death if not administered properly. Paxson testified that when D50 is administered by any method other than via the veins, the receiving hospital must be notified of the medication error.
 {¶ 37} Paxson also testified that there is a volume restriction of "10 cc's" for liquid medications administered via the ET Tube. He testified that the exception to the "10 cc rule" involves Epinephrine which can be administered at eleven cc's via the ET Tube. Paxson testified that a dose of D50 has a volume of "50 cc's".
 {¶ 38} Further, the Trustees found that D50 is more difficult to administer than Epinephrine. Contrary to Snyder's claim, Paxson's testimony does support this finding. Specifically, Paxson testified that D50 is a larger dose of medication, and thus, naturally, takes more time to administer; approximately "ten to fifteen seconds" while Epinephrine takes only "three to five seconds." He testified that D50 is a more "syrupy" or "viscous" medication than Epinephrine, and thus, is more difficult to push out of its ampoule. He also testified that because of its thick nature, a paramedic might use two hands to push a D50 ampoule while the Epinephrine ampoule can be easily administered with one hand.
 {¶ 39} We conclude that the evidence supports a finding that paramedics are trained to know that D50 can cause necrosis of tissue. We further conclude that the evidence supports a finding that a dose of D50 greatly exceeds the volume restrictions for the administration of medications through an ET Tube. We also conclude that there is evidence to support a finding that D50 is more difficult to administer. Therefore, we reject Snyder's claim that the Trustees and the trial court erred with regard to these findings.
 {¶ 40} Snyder's next argument centers on the Trustees' conclusion that, at the time of the incident, she knew that she was administering the D50 and that she knowingly failed to alert the receiving hospital of the mistake in medication. She contends that the Trustees erred in concluding that she knew, and was dishonest, about the mistake.
 {¶ 41} Based upon the evidence presented, the Trustees concluded that Snyder was aware of her actions and that she attempted to cover them up. The evidence demonstrates that Snyder was concerned about the patient's blood sugar, and that she advised Williams to "look into it." Williams however informed her that other actions needed to be taken prior to dealing with the blood sugar. The evidence further shows that, despite Williams' statement, Snyder pulled the D50 ampoule and an epinephrine ampoule out of the drug bag and placed them beside her at her station by the patient's head. The evidence shows that Snyder administered the first does of Epinephrine via the ET Tube. The evidence also demonstrates that she administered a second drug into the ET Tube. Finally, the evidence shows that D50 is clearly marked and is in a different colored box than Epinephrine, and that administration of D50 is significantly different than administration of Epinephrine. We conclude that this evidence reasonably supports the inference that Snyder was aware of her actions at the time of the incident. Even if Snyder did act by mistake and confused the D50 with the Epinephrine, we cannot disagree with the Trustees' conclusion that she knew of the mistake afterward. After the incident, Snyder was holding an empty ampoule of D50. Significantly, she did not claim that any other paramedic had administered the D50 or that she was under the impression that it had been given by another paramedic. Despite this fact, Snyder proceeded to take a second blood sugar reading, which she admitted is normally only done after the administration of D50.
 {¶ 42} Snyder also contends that the Trustees erred by finding that she demonstrated a lack of proficiency with respect to Department policies and procedures. However, given that she administered a drug in an improper manner and that she failed to inform anyone of the mistake, we conclude that this argument is without merit.
 {¶ 43} Finally, Snyder contends that she should not have been terminated for this incident. In support, she cites her lack of previous disciplinary problems or mistakes. We cannot agree based upon the evidence listed above. Snyder took action that she was not authorized to take. She administered a liquid into a patient's lung despite the fact that the amount of the dose was higher than the liquid restrictions for ET Tubes and despite the fact that the drug has a known tendency to kill surrounding tissue. She administered a drug into the ET Tube, was holding an empty D50 ampoule, and proceeded to re-check the blood sugar level. Snyder failed to inform anyone that she had made a mistake. All of this leads to our conclusion that the Trustees were within their discretion to determine that termination was a reasonable and appropriate discipline.
 {¶ 44} Snyder's sole assignment of error is overruled.
 III {¶ 45} Snyder's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
 . . . . . . . . . . .
Brogan and Donovan, JJ., concur.